# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| REALTIME DATA, LLC D/B/A/ IXO, | § | |
| | § | |
| Plaintiff, | § | |
| | § | No. 11 Civ. 6696 (KBF) |
| v. | § | No. 11 Civ. 6701 (KBF) |
| | § | No. 11 Civ. 6704 (KBF) |
| MORGAN STANLEY, ET AL., | § | |
| | § | |
| | § | |
| Defendants. | § | ECF Case |
| ------------------------------------------------X | | |
| REALTIME DATA, LLC D/B/A/ IXO, | § | |
| | § | |
| Plaintiff, | § | |
| | § | No. 11 Civ. 6697 (KBF) |
| v. | § | No. 11 Civ. 6699 (KBF) |
| | § | No. 11 Civ. 6702 (KBF) |
| CME GROUP INC., ET AL., | § | |
| | § | |
| | § | |
| Defendants. | § | ECF Case |
| ------------------------------------------------X | | |
| REALTIME DATA, LLC D/B/A/ IXO, | § | |
| | § | |
| Plaintiff, | § | |
| | § | No. 11 Civ. 6698 (KBF) |
| v. | § | No. 11 Civ. 6700 (KBF) |
| | § | No. 11 Civ. 6703 (KBF) |
| THOMSON REUTERS, ET AL., | § | |
| | § | |
| | § | |
| Defendants. | § | ECF Case |
| ------------------------------------------------X | | |

# PLAINTIFF REALTIME'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT FOR FAILURE TO COMPLY WITH THE WRITTEN-DESCRIPTION REQUIREMENT

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES .........................................................................................iii

TABLE OF ABBREVIATIONS ..................................................................................... iv

INTRODUCTION ...........................................................................................................1

ARGUMENT....................................................................................................................3

I.    The Disclosure of "Packets" in the '747 Patent Supports the
      Claimed "Data Packets."........................................................................................3

      A.    The '747 patent discloses "data packets" to a skilled
            artisan......................................................................................................3

      B.    Defendants' arguments are factually devoid and legally
            unsupported..............................................................................................4

II.   All Claims of the '568 and '651 Patents Are Supported by the
      Common Specification...........................................................................................6

      A.    The common specification supports each limitation-at-
            issue..........................................................................................................7

            1.    "the encoding does not require packet-to-packet
                  data dependency"; "packet independent data
                  encoding" ....................................................................................7

            2.    "the memory resets the adaptive table at a
                  determinate point of the data packet"; "resetting one
                  or more of the adaptive local state machines at  a
                  determinate point of the encoded data path"; and
                  "resetting the adaptive table at a determinate point
                  of encoded data path"..................................................................9

            3.    "using a synchronization system, wherein the
                  financial data stream includes a plurality of
                  synchronization points"; "[includes/including]  a
                  plurality of synchronization points in the financial
                  data stream" .............................................................................10

      B.    Defendants offer no competent evidence that a skilled
            artisan would not understand the specifications to disclose
            the claim terms-at-issue. .......................................................................11

III.    The '568 Patent Provides Adequate Written-Description Support
        for the Claimed "Executable Files." ...................................................................13

        A.    A skilled artisan would understand that the disclosed
              "compiler" supports the claimed "executable files." ...............................13

        B.    Defendants mischaracterize the case law to suggest that the
              Federal Circuit has created a bright-line rule for genus
              claims, when it has not. ........................................................................14

CONCLUSION .........................................................................................................16

# TABLE OF AUTHORITIES

## CASES

*All Dental Prodx LLC v. Advantage Dental Prod., Inc.,*
   309 F.3d 774 (Fed. Cir. 2002) ............................................................... 1, 5

*Ariad Pharms., Inc. v. Eli Lilly & Co.,*
   598 F.3d 1336 (Fed. Cir. 2010) (en banc) ................................................. passim

*Boston Scientific Corp. v. Johnson & Johnson,*
   647 F.3d 1353 (Fed. Cir. 2011) ............................................................ 14, 15

*Capon v. Eshhar,*
   418 F.3d 1349 (Fed. Cir. 2005) ............................................................. 9, 15

*Crown Packaging Tech., Inc. v. Ball Metal Beverage Container Corp.,*
   635 F.3d 1373 (Fed. Cir. 2011) .............................................................. 1, 2

*Enzo Biochem, Inc. v. Gen-Probe, Inc.,*
   323 F.3d 956 (Fed. Cir. 2002) .............................................................. 9, 15

*F5 Networks Inc. v. A10 Networks, Inc.,*
   2011 U.S. Dist. LEXIS 73689 (W.D. Wash. Jul. 8, 2011) ............................... 12

*Invitrogen Corp. v. Clontech Laboratories, Inc.,*
   429 F.3d 1052 (Fed. Cir. 2005) .............................................................. 2, 4

*Lockwood v. American Airlines, Inc.,*
   107 F.3d 1565 (Fed. Cir. 1997) ................................................................ 5

*Stored Value Solutions v. Card Activation Technologies,*
   796 F. Supp. 2d 520 (D. Del. 2011) ........................................................ 5, 6

*Superguide Corp. v. DirecTV Enterprises, Inc.,*
   358 F.3d 870 (Fed. Cir. 2004) .................................................................. 4

*Tesco Corp. v. Weatherford Int'l, Inc.,*
   750 F. Supp. 2d 780 (S.D. Tex. 2010) ....................................................... 12

*Vas-Cath Inc. v. Mahurkar,*
   935 F.2d 1555 (Fed. Cir. 1991) .......................................................... passim

## STATUTES

35 U.S.C. § 112, ¶ 1 ............................................................................. 21

## OTHER AUTHORITIES

MPEP § 2163 ....................................................................................... 16

## TABLE OF ABBREVIATIONS

| **Abbreviation** | **Item** |
| --- | --- |
| D.E. | Docket Entry |
| D.Br. | Defendant's Memorandum of Law in Support of Defendants' Motion for Summary Judgment for Failure to Comply with the Written Description Requirement (D.E. 571). |
| Realtime | Plaintiff Realtime Data, LLC d/b/a IXO |
| Defendants | Defendants CME Group, Inc.; Board of Trade of the City of Chicago, Inc.; the New York Mercantile Exchange, Inc.; BATS Trading, Inc.; International Securities Exchange, LLC; Chicago Board Options Exchange, Inc.; Boston Options Exchange Group, LLC; NYSE Euronext; NYSE Arca, Inc.; NYSE Amex, LLC; Securities Industry Automation Corp.; Options Price Reporting Authority LLC; NASDAQ OMX Group, Inc.; and NASDAQ OMX PHLX, Inc. |
| '747 Patent | United States Patent No. 7,714,747 |
| '568 Patent | United States Patent No. 7,417,568 |
| '651 Patent | United States Patent No. 7,777,651 |
| PSMF | Plaintiff's Counter-Statement of Material Fact |
| DSMF | Defendants' Statement of Material Fact |

## INTRODUCTION

The '568, '651, and '747 Patents are each directed to systems and methods for compressing and transmitting data. Each patent provides a detailed disclosure—including algorithms, flowcharts, and diagrams—that a skilled artisan would understand to show that the inventors had possession of their claimed inventions. Having been reviewed and issued by the Patent Office, each claim is entitled to a presumption of validity.

Defendants' motion for summary judgment challenges the sufficiency of the disclosure relating to 5 terms appearing in 34 claims among these 3 patents-in-suit. They bear a heavy burden of presenting clear and convincing evidence that a skilled artisan would not understand the specifications-at-issue to disclose the claimed invention. *See Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351, 1354 (Fed. Cir. 2010) (*en banc*). Defendants do not come close to meeting that burden here.

Each of the challenged claim terms have more than adequate support in the written descriptions. As set forth in the accompanying declaration of Dr. Michael Shamos, the challenged claim terms are described with sufficient detail for a skilled artisan to understand the inventions. Defendants' motion for summary judgment is unsupported by any testimonial evidence of a skilled artisan's understanding.

The written-description requirement of the 35 U.S.C. § 112, first paragraph, is an issue of fact. *See Crown Packaging Tech., Inc. v. Ball Metal Beverage Container Corp.*, 635 F.3d 1373, 1380 (Fed. Cir. 2011). The principal thrust of Defendants' motion is that certain claim terms are not verbatim recited in the patent specification. But the written-description requirement does impose such a requirement. *See All Dental Prodx LLC v. Advantage Dental Prod., Inc.*, 309 F.3d 774, 779 (Fed. Cir. 2002) ("In order to comply with the written description requirement, the specification need not describe the claimed subject matter in exactly the same terms as used in

the claims; it must simply indicate to persons skilled in the art that as of the filing date the applicant had invented what is now claimed.") (internal quotation and punctuation omitted). Moreover, Defendants' rest their motion almost entirely upon attorney argument concerning the meaning of the patents' specifications. But unadorned and unsupported attorney arguments concerning the meaning of technical documents (such as a patent specification) do not, and cannot, supplant competent and supported expert testimony regarding a skilled artisan's understanding. *See Invitrogen Corp. v. Clontech Laboratories, Inc.*, 429 F.3d 1052, 1068 (Fed. Cir. 2005). Such arguments certainly do not suffice as evidence on the factual issue of the sufficiency of the patent's written description and whether a person of skill in the art would recognize that the inventors possessed the claimed invention when they filed their application. That deficiency in Defendants' proofs is particularly acute when faced, as they are here, with the high burden of providing invalidity by clear and convincing evidence.

Defendants attempt to distract from the paucity of their supporting evidence by seeking to impugn Realtime's legitimate efforts during certain reexamination proceedings to maintain patent protection for its valuable intellectual property. These imagined machinations are irrelevant to whether the claims of the patents are sufficiently disclosed within the four corners of the patent specification as understood by a skilled artisan. *See Ariad* 598 F.3d at 1351-54.

Put simply, Defendants have not met their burden of showing that no reasonable fact finder could return a verdict in favor of Realtime on the issue of the sufficiency of the written description. *See Crown Packaging*, 635 F.3d at 1380. As a consequence, the motion should be denied.

## ARGUMENT

I.     **THE DISCLOSURE OF "PACKETS" IN THE '747 PATENT SUPPORTS THE CLAIMED "DATA PACKETS."**

Defendants contend that claims 1, 7-8, 13-14, 18-19, and 22 of the '747 Patent are invalid because the term "data packets" is absent from the written description. (D.Br. at 5-9.) This argument mischaracterizes the specification, ignores basic grammar, and walks away from the undisputed and well-understood meaning in the art of the term "packet."

A.     **The '747 patent discloses "data packets" to a skilled artisan.**

The '747 Patent is directed to systems and methods for providing fast and efficient data compression. (PSMF, ¶ 1.) The accompanying written description explains that in these exemplary systems and methods "data compression is performed on a per data block basis." (PSMF, ¶ 2 .)

A "data block" is expressly and repeatedly defined by the written description to "represent any quantity of data from a single bit through a multiplicity of files or *packets* and may vary from block to block." (PSMF, ¶ 3 (emphasis added)). From this description, a skilled artisan would understand that the '747 Patent teaches that data may be compressed on a bit level, a file level, or a packet level. (PSMF, ¶ 4.)

Basic grammar confirms that this reference to "packets" is shorthand for "data packets." The written description uses the terms "bit," "files," and "packets" as part of a prepositional phrase to modify the term "quantity of data." (PSMF, ¶ 3 ("As previously stated a data block may represent any quantity of data from a single bit through a multiplicity of files or *packets* and may vary from block to block.") ('747 Patent at 18:6-9, 20:58-61, 23:47-50) (emphasis added).) This unequivocally conveys to a skilled artisan that the term "bit" refers to a *data* bit, the term "files" refers to *data* files, and the term "packets" refers to *data* packets. *See Superguide Corp.*

*v. DirecTV Enterprises, Inc.*, 358 F.3d 870, 886 (Fed. Cir. 2004) (applying the grammatical rule that "an article of a preposition applying to all the members of the series must either be used only before the first term or else be repeated before each term") (internal citation omitted).

The '747 Patent's use of the term "packets" as a reference to "data packets" is further reinforced by the very dictionaries Defendants cite to support their proposed claim constructions in this case. (PSMF, ¶¶ 5-6 ("packet (1) A group of binary digits including data and control elements which is switched and transmitted as a composite whole. The data and control elements and possibly error control information are arranged in a specified format."); *id.*, ¶¶ 5, 7; *id.*, ¶¶ 5, 8 ("packet . . . n. 1. A unit of information transmitted as a whole from one device to another on a network."); *id.,* ¶ 9.)   In the context of the '747 Patent, a skilled artisan would recognize that "packets" refers to "data packets" and that the patentees "invented what is claimed." *Vas-Cath Inc. v Mahurkar*, 935 F.2d 1555, 1563 (Fed. Cir. 1991) . (*See also* PSMF, ¶¶ 1-10.)

**B.     Defendants' arguments are factually devoid and legally unsupported.**

Defendants' arguments to the contrary are just that—arguments. *See Invitrogen*, 429 F.3d at 1068. They offer no evidence of how a skilled artisan would understand the specification's disclosure of "packets." And they ignore that Section 112 "requires an objective inquiry into the four corners of the specification from the ***perspective of a person of ordinary skill in the art.***" *Ariad*, 598 F.3d at 1351 (emphasis added).

Defendants first argue (D.Br. at 7) that the written description does not use the term "data packet" or formal data structure or control information. As set forth above, Defendants' argument is meritless because the specification discloses "packets" as a type of "data block." But even if that express disclosure were not there, "[t]he failure of a specification to specifically mention a limitation that later appears in the claims is not a fatal one when," as here, "one skilled

in the art would recognize upon reading the specification that the new language reflects what the specification shows had been invented." *All Dental,* 309 F.3d at 779.

Defendants attempt (D.Br. at 8) to diminish the specification's disclosure of data packets by arguing that the specification is referring only to the size of a data block and does not disclose verbatim the claimed "data packets." But this naked assertion is contradicted by the parties' agreed-upon meaning for the term "packets"—*i.e.*, "information limited in type, format, and content and able to be transmitted as a unit across a packet-switched network, the packet including control information that enables the packet to be delivered to an intended destination in the network." (PSMF, ¶ 11 (*See* D.E. 571 at 7 n.5).) Nothing about that definition implies that a "packet" is distinguished by its size.

Defendants' reliance on *Lockwood v. American Airlines, Inc.,* 107 F.3d 1565 (Fed. Cir. 1997) is misplaced. In that case, the issue was whether a patentee could claim priority to an earlier-filed application. It was "undisputed" that one of the applications in the chain of priority, however, did not describe the claimed feature of "an individual terminal containing a video disk player." *Id.* at 1572. Since each application in the chain of priority did not disclose the claimed feature, the patentee could not obtain the benefit of the earlier filing date even though the claim feature may have been an obvious variant of what was disclosed. *Id.* But here, in contrast, the specification discloses data packets and this does not require "speculat[ion] as to modifications the inventor might have envisioned." *Id.* Data packets are expressly disclosed.

Defendants' reliance (D.Br. at 9) on *Stored Value Solutions v. Card Activation Technologies,* 796 F. Supp. 2d 520 (D. Del. 2011) is similarly misplaced. In that case, the district court found a patent claiming a method for processing electronic transactions to be invalid because the claims recited a method involving four steps, but the specification did not

disclose any embodiments comprising each of those steps. *Id.* at 539. Thus, even though the specification disclosed various combinations of those steps, the lack of a disclosure of a combination of those four steps together rendered the claims invalid under § 112. *Id.* Here, the claimed "data packets" do not rest upon some undisclosed combination of elements in the specification. Rather, the specification explicitly discloses data packets in a manner that a skilled artisan would understand. And contrary to Defendants' suggestion, the court in *Stored Values* did not find the claims invalid under § 112 based on "arguments" made during reexamination. Rather, the district court made clear that it was basing its finding "'solely on the face of the patent specification.'" *Id.* at 547.

* * *

In sum, when properly viewed through the eyes of a skilled artisan (which Defendants failed to do), the '747 Patent specification  discloses and supports the claimed "data packets." Thus, the claims of the '747 patent satisfy the written-description requirement. At a minimum, however, Defendants failure to provide or cite any testimony by a skilled artisan to support their argument, in light of the testimony of Dr. Shamos, raises a disputed issue of material fact concerning the '747 Patent's disclosure of "data packets." As a consequence, their motion should be denied.

## II.   ALL CLAIMS OF THE '568 AND '651 PATENTS ARE SUPPORTED BY THE COMMON SPECIFICATION.

Defendants also urge the Court to grant summary judgment of invalidity for lack of written description with respect to claim 32 of the '568 Patent and claims 4, 15-16, 18, 24-25, 34, 37, 45-47, 61, 63, 93-95, 110-112, and 116-118 of the '651 Patent. (D.Br. at 9.) Defendants' argument is entirely and erroneously predicated upon statements made during the course of an ongoing and unconcluded reexamination of a different patent involving different claim terms.

Consequently, Defendants' motion demonstrates neither clear and convincing evidence of invalidity nor the absence of disputed issues of material fact that would entitle them to summary judgment.

**A.    The common specification supports each limitation-at-issue.**

**1.      "the encoding does not require packet-to-packet data dependency"; "packet independent data encoding"**

Defendants argue that the common specification of the '568 and '651 Patents lacks adequate written description for the packet independent encoding features of the invention— namely, "the encoding does not require packet-to-packet data dependency" or "packet independent encoding."[1]  This argument is erroneous and contrary to the explicit teachings of the common specification, which discloses techniques that compress and decompress data, and that is capable of performing the claimed compression and decompression techniques on a packet-by-packet (*i.e.*, packet independent) basis.  (PSMF, ¶ 13.)

Referring to FIG. 1 of the '568 and '651 Patents (reproduced below), the common specification discloses an exemplary system, which includes:  (1) a data server 12 that compresses a data stream; (2) a collection of components that transmit the compressed data; and (3) end users or clients 19 that receive and decompress the data.  (PSMF, ¶ 12.)[2]

---

[1] These terms are found in claim 32 of the '568 Patent and claims 18, 25, 34, 47, 63, 95, 112, and 118 of the '651 Patent.

[2] For ease of reference, this brief cites only to the '568 Patent with the understanding that the identical disclosure appears in the '651 Patent as well.



FIG. 1

The data stream that the data server 12 compresses is segmented into data packets. (PSMF, ¶ 13.) Prior-art techniques would compress a data stream by constructing libraries of character strings that appeared in different packets. Such library-based compression schemes, such as Zlib, Glib, and Lempel-Ziv, relied on data from one packet to compress the data in subsequent packets (*i.e.*, packet-dependent compression). (PSMF, ¶¶ 14-15.) This would require the compression algorithm to analyze every data packet, examine the data packets for repeating strings of characters, find that character string in the library, and replace the duplicate character string with a reference to a location in the library, and thereby compress the data in the data stream. (PSMF, ¶ 15.) In this way, prior-art compression techniques had so-called packet-to-packet data dependencies. (PSMF, ¶ 16.) Although these techniques could achieve relatively high compression ratios, they suffered from undesirably slow transmission rates because of the processing time required to analyze the data stream, build the library, and then look for the duplicate character strings in the subsequent data packets. (PSMF, ¶ 14-17.)

The common specification of the '568 and '651 Patents distinguishes the prior art compression techniques and teaches compression with "no packet-to-packet data dependency." (PSMF, ¶¶ 18-19.) Rather than analyzing all data packets and attempting to identify duplicate data strings across or between packets, the '568 and '651 Patents disclose compressing and decompressing data packets one at a time and without relying on the data contained in one packet

to compress or decompress data in subsequent packets.  (PSMF, ¶ 19.)  Packet independence is

only recited in dependent claims.  (PSMF, ¶ 20.)  The application of the compression and

decompression schemes recited in the independent claims does not depend at all on the size of

the data set being compressed.  Packet independence, on the other hand, does limit the size of the

data set to which the claimed compression and decompression schemes are applied—it limits

that data to only the amount of data that can be carried in a single data packet.  (PSMF, ¶ 21.)

> 2.     **"the memory resets the adaptive table at a determinate point of the
> data packet"; "resetting one or more of the adaptive local state
> machines at  a determinate point of the encoded data path"; and
> "resetting the adaptive table at a determinate point of encoded data
> path"**

Defendants next argue that six claims of the '651 Patent are invalid because the claimed

resetting of a local state machine or an adaptive table is unsupported by the specification.  (*See*

D.E. 571 at 12-13.)  The crux of Defendants' argument is that "the word 'reset' does not appear

even once in the common specification."  (*Id.* at 13.)  But a patent's specification need not recite

the claimed invention verbatim.  *See Ariad*, 598 F.3d at 1352.  All that is required is a description

of "an invention understandable to th[e] skilled artisan."  *Id.* at 1351.  This determination "is

essentially a fact-based inquiry that will 'necessarily vary depending on the nature of the

invention claimed.'"  *Enzo Biochem, Inc. v. Gen-Probe, Inc.*, 323 F.3d 956, 963 (Fed. Cir. 2002)

(quoting *Vas-Cath*, 935 F.2d at 1563).  "Specifically, the level of detail required to satisfy the

written description requirement varies depending on the nature and scope of the claims and on

the complexity and predictability of the relevant technology."  *Ariad*, 598 F.3d at 1351 (citing

*Capon v. Eshhar*, 418 F.3d 1349, 1357-58 (Fed. Cir. 2005)).

As explained by Dr. Shamos in his declaration (PSMF, ¶¶ 22-24), one of ordinary skill in

the art would immediately recognize and understand that the local state machine, or adaptive

table, ***must*** be reset with each packet or there would be no packet independence.  Since packet

- 9 -

independence, by definition, has no packet-to-packet data dependency, the local state machine or adaptive table must necessarily be reset and scrubbed after compressing or decompressing each data packet.  Otherwise the local state machine or adaptive table would retain data from the preceding packet(s) and would not meet the definition of packet independence.

These concepts of using a synchronization point to reset a state machine or adaptive table would have been immediately recognized by a person of skill in the art, as explained by Dr. Shamos.  (PSMF, ¶¶ 22-24 .)  Defendants' motion offers no evidence whatsoever to dispute Dr. Shamos's testimony on this point.  Defendants thus fail to meet their heavy burden of proving invalidity by clear and convincing evidence.

3.    **"using a synchronization system, wherein the financial data stream includes a plurality of synchronization points"; "[includes/including] a plurality of synchronization points in the financial data stream"**

Defendants also argue that eight claims of the '651 patent lack written-description support because "the only disclosure of the claimed synchronization points is the aspirational statement: 'synchronization points are preferably included in the compressed data stream.'" (*See* D.E. 571 at 13-14 (quoting '568 Patent at 12:12-13).)  But the specification's disclosure of synchronization points is more than "aspirational" as Defendants contend; rather, it is part of the "invention understandable to th[e] skilled artisan." *Ariad*, 598 F.3d at 1352.

As discussed above, the '651 patent discloses that data is:  (1) compressed by a data server 12; (2) transmitted to end users or clients 19; and (3) decompressed by the end users or clients 19.  (PSMF, ¶ 25.)



FIG. 1

The common specification further states that "clearly identifiable synchronization points are preferably included in the compressed data stream" to enable the end users or clients 19 to pick up the transmissions from the data server 12 at any time.  (PSMF, ¶ 26.)  The '651 Patent further explains how one preferred embodiment of the claimed synchronization points may be used: "the [end users or clients 19] will accumulate the compressed data until at least a sequence of 4 bytes each having a [specific] value … is detected in the input stream, at which point decompression will commence on the compressed input stream."  (PSMF, ¶ 27.)  This disclosure "reasonably conveys to those skilled in the art that the inventor had possession of the claimed [synchronization points] as of the filing date."  *See Ariad*, 598 F.3d at 1351 (citing *Vas-Cath*, 935 F.2d at 1563).  (*See also* PSMF, ¶ 27.)

### B.    Defendants offer no competent evidence that a skilled artisan would not understand the specifications to disclose the claim terms-at-issue.

The principal evidence offered by Defendants to support their assertion that these limitations lack adequate support in the written description are quotations from a Patent Office examiner's remarks in a pending reexamination involving a different, unasserted patent with different claims.  (D.Br. at 12-14 (citing DSMF ¶¶ 30, 34-37.)  But even if the examiner's remarks were relevant and admissible evidence, these statements hardly constitute clear, convincing, and undisputed evidence of invalidity that entitle Defendants to summary judgment.

It is telling that Defendants have not cited a single case where a Court has granted summary judgment of invalidity based on an examiner's rejection of claims during a still-pending reexamination of a different patent. It is also telling that Defendants have not cited a single case where a court has even permitted such a rejection to be relied upon as evidence that validly issued claims in a different patent do not meet the written-description requirement.

Other courts faced with similar issues have excluded such evidence from trial for several reasons. Among those is that the standard for evaluating a patent during reexamination is different than the burden imposed upon a defendant seeking to invalidate a patent claim. *Tesco Corp. v. Weatherford Int'l, Inc.*, 750 F. Supp. 2d 780, 794 (S.D. Tex. 2010). In addition, even if such statements were relevant, their introduction to the jury would present a substantial risk of prejudice that the jury erroneously "would view the examiner['s conclusions] as expert and authoritative." *Id.* These risks are even more significant where the reexamination is still pending and any claim rejections are not final. *See F5 Networks Inc. v. A10 Networks, Inc.*, 2011 U.S. Dist. LEXIS 73689, at *6-12 (W.D. Wash. Jul. 8, 2011) (discussing Federal Circuit precedent and district courts that have refused to consider statements from unconcluded reexamination proceedings).

Defendants also erroneously imply (D.Br. at 11-12) that the Patent Office did not have the opportunity to consider the sufficiency of the written description because of the constraints of the reexamination procedure. But the original-prosecution examiner not only had the *opportunity* to consider the sufficiency of the written description for each issued claim, but was actually *required* to do so. (PSMF, ¶ 28.) Following the Patent Office's Written-Description Guidelines, which "form part of the normal examination process," *id.*, the original-prosecution examiner found that all claims are properly supported—contrary to what was allegedly "found"

during the pending reexamination.  At a minimum, the fact that the original-prosecution

examiner in both the '568 and '651 Patents found the claims-at-issue to be valid controverts

Defendants' reliance on the reexamination examiner's consideration of different claims in a

different patent.

III.    **THE '568 PATENT PROVIDES ADEQUATE WRITTEN-DESCRIPTION SUPPORT FOR THE CLAIMED "EXECUTABLE FILES."**

Defendants' last attack is that claims 20, 22, and 23 of the '568 Patent are invalid because

the claimed "executable files" allegedly lack written-description support.  (*See* D.Br. at 14-16.)

But yet again Defendants' argument fails to put forward evidence of how a skilled artisan would

understand that '568 Patent.  Moreover, Defendants erroneously suggest that the Federal Circuit

has created a bright-line rule for genus claims, which it most surely has not.

A.    **A skilled artisan would understand that the disclosed "compiler" supports the claimed "executable files."**

The specification of the '568 Patent says that "a data field specific compiler" may be

used to create specific types of "algorithms."  (PSMF, ¶ 29.)  A skilled artisan would understand

that the disclosed "compiler" translates ***source code*** into ***object code***.  (PSMF, ¶ 30.)  Source

code is written in a high-level language (such as, C++, Java, or Cobalt) and is what a

programmer uses to create a software program.  (PSMF, ¶ 31.)  Object code contains machine

language (*i.e.*, a collection of 1's and 0's) and is what a computer uses to execute the software

program written by the programmer.  (PSMF, ¶ 32.)  In other words, a skilled artisan would

know that a compiler allows programmers to write programs using a high-level language rather

than the 1's and 0's understood by computers.  (PSMF, ¶ 33.)

This understanding of the term "compiler" is confirmed by one of the very same

dictionaries that Defendants cited to support their opening claim-construction brief.  (*See* D.E.

563-23.) This dictionary defines a compiler as "[a] program that translates all the source code of a program written in a high-level language into object code prior to execution of the program." (PSMF,¶ 34 ; *see also id.* ¶ 35 ("**compiler (software)** A computer program that translates programs expressed in a high-order language into their machine language equivalents.").) These dictionary definitions, therefore, further illustrate that a skilled artisan would know that the disclosed "compiler" implicates both source code and executable files because a compiler translates source code into executable files.

In addition, the specification explicitly discloses that "[t]he various processes and functions described herein may be either part of the hardware, microinstruction code or application programs that are *executed* via the operating system, or any combination thereof." (PSMF, ¶ 36 (emphasis added).) This disclosure is additional evidence that the claimed "executable files" is adequately supported by the written description.

Thus, the specification's disclosure of a compiler and programs executed by the operating system "reasonably conveys to those skilled in the art that the inventor had possession of the claimed [executable files] as of the filing date." *See Ariad*, 598 F.3d at 1351 (citing *Vas-Cath*, 935 F.2d at 1563). Accordingly, the claimed "executable files" have adequate written-description support.

## B. Defendants mischaracterize the case law to suggest that the Federal Circuit has created a bright-line rule for genus claims, when it has not.

Defendants' argument that "executable files" is not supported by the specification hinges on an erroneous characterization of the holding in *Boston Scientific Corp. v. Johnson & Johnson*, 647 F.3d 1353 (Fed. Cir. 2011). (*See* D.E. 571 at 15.) Specifically, Defendants assert that *Boston Scientific* stands for the proposition that "[t]he description of a broad category (*i.e.*, a genus) is not sufficient to provide written description support for particular species." (*Id.*) But,

as explained below, *Boston Scientific* is distinguishable on its facts and does not stand for the broad proposition urged by Defendants.

In *Boston Scientific*, the Federal Circuit affirmed the invalidity of claims for lack of written-description support based in part on "the unpredictability of the art and the nascent state of using drug-eluting stents to inhibit restenosis." 647 F.3d at 1366-67. Unlike the "drug-eluting stents [used] to inhibit restenosis" in *Boston Scientific*, the compilers and executable files at issue here are not "unpredictable," but are rather very well understood in the art. (PSMF, ¶¶ 29-37.) Thus, *Boston Scientific* is distinguishable on its facts.

Moreover, Defendants' broad characterization of the holding in *Boston Scientific* is wrong because the Federal Circuit did not—and has not—set "any bright-line rules governing, for example, the number of species that must be disclosed to describe a genus claim, as this number necessarily changes with each invention, and it changes with progress in a field." *Ariad*, 598 F.3d at 1351. Rather, the written-description inquiry "is essentially a fact-based inquiry that will 'necessarily vary depending on the nature of the invention claimed.'" *Enzo Biochem*, 323 F.3d at 963 (quoting *Vas-Cath*, 935 F.2d at 1563). Thus, the Federal Circuit has articulated factors to be considered in the written-description inquiry, *see Capon*, 418 F.3d at 1357-58, not "bright-line rules," *Ariad*, 598 F.3d at 1351.

\* \* \*

As set forth above, and as Dr. Shamos explains in his declaration (PSMF ¶¶ 30-33), the disclosure of a compiler "reasonably conveys to those skilled in the art that the inventor had possession of the claimed [source code and executable files] as of the filing date." *See Ariad*, 598 F.3d at 1351 (citing *Vas-Cath*, 935 F.2d at 1563). Thus, the specification satisfies the written-description requirement. Moreover, Defendants have not put forward clear, convincing,

and *undisputed* evidence that a skilled artisan would find the support in the specification for "executable files" to be lacking.  Thus, Defendants' motion for summary judgment should be denied.

## CONCLUSION

As shown above, a skilled artisan would understand the specifications of the patents-in-suit to provide adequate disclosure of the claimed inventions.  Defendants, in contrast, have failed to offer any evidence of how one of ordinary skill in the art would understand the claims and the disclosure in the patents-in-suit.  Dr. Shamos, on the other hand, explains in detail in his declaration why one of ordinary skill in the art would readily comprehend and appreciate that the inventors possessed, and adequately described, the full scope of the claimed inventions of the patents-in-suit.  At the very least, a material factual dispute exists regarding how a skilled artisan would understand the disclosure contained in these patents, and that dispute creates a triable issue of fact that precludes summary determination.  Accordingly, Defendants' motion should be denied.

Dated: April 18, 2012                         Respectfully submitted,

                                              **McKool Smith, P.C.**

                                              */s/ Robert A. Cote*
                                              _____

                                              Robert A. Cote
                                              rcote@mckoolsmith.com
                                              Brett E. Cooper
                                              bcooper@mckoolsmith.com
                                              Daniel J. Melman
                                              dmelman@mckoolsmith.com
                                              Lauren L. Fornarotto
                                              lfornarotto@mckoolsmith.com
                                              One Bryant Park, 47th Floor
                                              New York, New York 10036

Telephone: (212) 402-9400
Facsimile: (212) 402-9444

Dirk D. Thomas
dthomas@mckoolsmith.com
1999 K Street NW, Suite 600
Washington, DC 20006
Telephone: (202) 370-8302
Facsimile: (202) 370-8344

**ATTORNEYS FOR PLAINTIFF
REALTIME DATA, LLC D/B/A/ IXO**

## CERTIFICATE OF SERVICE

The undersigned certifies that true and correct copies of the foregoing document were served via email to all counsel of record on April 18, 2012.

*/s/ Daniel J. Melman*
Daniel J. Melman