```
                                          ┌─────────────────────────┐
                                          │ USDC SDNY               │
                                          │ DOCUMENT                │
                                          │ ELECTRONICALLY FILED    │
UNITED STATES DISTRICT COURT              │ DOC #:___ -             │
SOUTHERN DISTRICT OF NEW YORK             │ DATE FILED JUN 2 7 2012 │
                                          └─────────────────────────┘
------------------------------------- X
REALTIME DATA, LLC d/b/a IXO,         :
                                      :        11 Civ. 6696 (KBF)
                    Plaintiff,        :        11 Civ. 6701 (KBF)
                                      :        11 Civ. 6704 (KBF)
        -v-                           :
                                      :
MORGAN STANLEY, et al.,               :
                                      :
                    Defendants.       :
------------------------------------- X
REALTIME DATA, LLC d/b/a IXO,         :
                                      :        11 Civ. 6697 (KBF)
                    Plaintiff,        :        11 Civ. 6699 (KBF)
                                      :        11 Civ. 6702 (KBF)
        -v-                           :
                                      :
CME GROUP INC., et al.                :
                                      :
                    Defendants.       :
------------------------------------- X
REALTIME DATA, LLC d/b/a IXO,         :
                                      :        11 Civ. 6698 (KBF)
                    Plaintiff,        :        11 Civ. 6700 (KBF)
                                      :        11 Civ. 6703 (KBF)
                                      :
        -v-                           :
                                      :        OPINION AND ORDER
THOMSON REUTERS, et al.               :        (Partial Motion for
                                      :        Summary Judgment re
                    Defendants.       :        Data Decompression)
------------------------------------- X
```

KATHERINE B. FORREST, District Judge:

Plaintiff Realtime Data, LLC d/b/a IXO ("Realtime") has filed nine separate lawsuits against more than 30 separate defendants. Realtime asserts that defendants (i.e., all defendants in the above-captioned actions) are, individually or collectively, infringing on 49 claims across three patents: U.S. Patent Nos. 7,714,747 ("the '747 Patent"), 7,777,651 ("the '651

1

Patent"), and 7,417,568 ("the '568 Patent" and with the '747

Patent and '651 Patent, the "patents-in-suit").   Both the '747

and the '651 Patents are continuations, in part, of prior

applications.  The '747 Patent traces its lineage back to an

original application filed on December 11, 1998 (referred to as

the '024 Patent, which issued in 2001 as the '761 Patent), and

the '651 Patent traces back to a provisional application filed

on October 3, 2000.

    Defendants[1] have now moved for summary judgment on the

grounds that the following claims are invalid for failure to

meet the definiteness and written description requirements of 35

U.S.C. § 112: claims 1, 7, 8 and 13 of the '747 Patent and

claims 1, 4, 6, 7 and 12 of the '651 Patent (collectively, the

"claims at issue").[2]

---

[1] The original moving defendants were the "Bank Defendants"--BNY ConvergEx Group LLC, BNY ConvergEx Execution Solutions LLC, Credit Suisse Holdings (USA), Inc., Credit Suisse Securities (USA) LLC, The Goldman Sachs Group, Inc., Goldman Sachs & Co., Goldman Sachs Execution & Clearing, L.P., HSBC Bank USA, N.A., HSBC Securities (USA), Inc., J.P. Morgan Chase & Co., J.P. Morgan Securities, Inc., J.P. Morgan Clearing Corp., Morgan Stanley, and Morgan Stanley & Co., Inc.  (See 11 Civ. 6696, Defs. Mem. of Law in Supp. of Mot. for Partial Summ. J. (Dkt. No. 429) at n.1.)  On April 4, 2012, the "Exchange Defendants"--NYSE Euronext, NYSE ARCA, Inc., NYSE AMEX, LLC, Securities Industry Automation Corporation, Options Price Reporting Authority, LLC, International Securities Exchange, Boston Options Exchange Group LLC, CME Group Inc., Board of Trade of the City of Chicago, Inc., New York Mercantile Exchange, Inc., Chicago Board Options Exchange, Incorporated, BATS Trading, Inc., NASDAQ OMX Group, Inc., and NASDAQ OMX PHLX, Inc.--joined in this motion (11 Civ. 6697, Dkt. No. 574), as did the "Data Provider Defendants"--Thomson Reuters Corporation, Factset Research Systems, Inc., Bloomberg L.P., Interactive Data Corporation, Penson Worldwide, Inc. and Nexa Technologies, Inc. (11 Civ. 6698, Dkt. No. 317).

[2] Defendants have not moved with respect to any claims asserted in the '568 Patent.  The Exchange Defendants filed a separate, additional motion for partial summary judgment (in which the Bank and Data Provider Defendants joined) which, inter alia, sought to invalidate certain claims of the '568

The claims at issue on this motion relate to decompressing compressed data using either "content dependent data decompression" or "content independent data decompression."  In support of their motion, defendants have submitted a declaration from James Storer, Ph.D, an expert in data compression and decompression.  ("Storer Decl." (Dkt. No. 431).)  In opposition to the motion, plaintiff has submitted a declaration from Michael Ian Shamos, J.D., Ph.D., an individual with expertise in the general area of electronic commerce.  ("Shamos Decl." (Dkt. No. 447).)  Although dueling expert declarations frequently create questions of fact which make summary judgment inappropriate, in this instance, the nature of the question before this Court allows for summary judgment despite the presence of dueling expert declarations.  To wit, the expert declarations do not create a triable issue of fact--rather, they clarify that there is none.  In other words, on all the critical points the experts agree or do not disagree.

The written description provision in 35 U.S.C. § 112 requires that the applicant demonstrate the he was in possession of the invention at the time the he submitted the relevant patent application.  In connection with the '747 Patent, that would have been in 1998; in connection with the '651 Patent that would have been in 2000.  In addition, section 112 requires that

Patent.  The Court denied that motion in a separate decision issued on June 26, 2012.

the description contain sufficient information such that those
of ordinary skill in the art can understand the parameters of
what is claimed.  That is simply not logically possible here:
the terms "content dependent data decompression" and "content
independent data decompression" have no meaning and the concepts
therefore contain no limitations that are understandable.

For the reasons set forth below, the Court grants
defendants' motion for partial summary judgment in its entirety.

BACKGROUND

I.   The Claims At Issue

At issue on this motion are two independent claims of the
'747 Patent (claims 1 and 8) and one independent claim of the
'651 Patent (claim 1).[3]  Defendants refer to claim 1 of the '747
Patent as "representative" of the other claims--and this Court
finds that it is.  That claims states:

> 1.   A method of decompressing one or more compressed data
> packets of a data stream using a data processor,
> wherein multiple decoders applying a plurality of
> lossless decompression techniques are applied to a
> data packet, the method comprising:
>
> Receiving a data packet from the data stream
> having one or more descriptors comprising one or more
> values, wherein the one or more descriptors indicate
> lossless encoders used to compress data blocks
> associated with the data packet, and further wherein
> the lossless encoders are selected based on analyses
> of content of the data blocks;

---

[3] The remainder of the claims that are part of this motion are dependent
claims.

> analyzing the data packet to identify a
> descriptor;
>
> selecting one or more lossless decoders for a
> data block associated with the data packet, wherein
> the selecting is based on the descriptor;
>
> decompressing the data block with a selected
> lossless decoder utilizing content dependent data
> decompression, if the descriptor indicates the data
> block is encoded utilizing content dependent data
> compression; and
>
> decompressing the data block with a selected
> lossless decoder utilizing content independent data
> decompression, if the descriptor indicates the data
> block is encoded utilizing content independent data
> compression.

'747 Patent, claim 1 (Decl. of Nicole E. Feit in Support of Defs.' Mot. for Partial Summ. J. ("Feit Decl.") (Dkt. No. 430) Ex. A).

II.   The Invention

The clearest way to understand the correctness of defendants' position is to understand the inventions set forth in the '747 and '651 Patents.

The '747 Patent is entitled "Data **Compression** Systems and Methods." (Feit Decl. Ex. A (emphasis added).)  The Summary of the Invention describes "systems and methods for providing fast and efficient data compression using a combination of content independent data compression and content dependent data compression."  No concept of content dependent or independent **decompression** is mentioned anywhere in the "Summary" section. That is unsurprising since the invention is concerned with a

number of steps that attempt to improve the speed and efficiency of compression.

The '747 Patent describes techniques in which content dependent data compression is performed on a data block when the data type (such as ACSII, MPEG, etc.) is identified; when the data type is not identified, then content independent data compression is utilized.  In both cases, in connection with analysis of the content of the data block, the appropriate lossless compression algorithm(s) is selected and applied.  The patent is clear that lossless compression algorithms are well known in the art and the invention is not creating a new lossless compression algorithm.

In addition, a descriptor containing information regarding which compression algorithm(s) was used is appended to the data block.  The descriptor plays an important role in the invention, it "indicate(s) the data encoding technique applied to the encoded data block."  (Patent '747 at 14:17-20.)  The data block then travels to the decoder module.  The decoder module includes a plurality of decoders for decoding the input data block using a decoder, set of decoders, or sequential set of decoders corresponding to the extracted compression type descriptor.  The decoders include those "lossless encoding techniques currently well-known within the art."  (Patent '747 at 14:60-65.)

In short, the data block is analyzed, if its data type is determined, content dependent data compression is utilized and a descriptor appended indicating which compression algorithm was used; if its data type is not recognized, then content independent data compression is utilized, and a descriptor is appended indicating which algorithm(s) was used to compress the data type(s).  The descriptor is then read on the other end, during data decompression, and the appropriate matching algorithm is applied.  Once the algorithm(s) has been determined and noted in the descriptor, whether compression was done "dependently" or "independently" of the content loses its relevance.  More to the point, all that is left to be done in decompression is to reverse the compression (however that compression was achieved) using the matching algorithm.

DISCUSSION

I.    Legal Principles

      A.   Summary Judgment

Summary judgment is appropriate when there is no genuine issue of fact requiring a trial, and such absence demonstrates that the movant is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Conclusory or speculative assertions are insufficient to create a material issue of fact.  Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995).

7

Issued patents carry a presumption of validity.  35 U.S.C. § 282.  A party seeking to invalidate a patent at summary judgment must submit "clear and convincing evidence of facts underlying invalidity" such that no reasonable fact finder could find otherwise.  See Trimed, Inc. v. Stryker Corp., 608 F.3d 1333, 1340 (Fed. Cir. 2010); Laryngeal mask Co. Ltd. V. Ambu A/S, 618 F.3d 1367 (Fed. Cir. 2010).

B.    35 U.S.C. § 112

35 U.S.C. § 112 provides, in pertinent part, that a patent specification

> shall contain a written description of the invention,
> and of the manner and process of making and using it,
> in such full, clear, concise, and exact terms as to
> enable any person skilled in the art to which it
> pertains, or with which it is most nearly connected,
> to make and use the same, and shall set forth the best
> mode contemplated by the inventor of carrying out his
> invention.

> The specification shall conclude with one or more
> claims particularly pointing out and distinctly
> claiming the subject matter which the applicant
> regards as his invention.

35 U.S.C. § 112 ¶¶ 1-2.

In determining whether a specification is sufficiently definite, a court must determine whether those skilled in the art would understand the scope of the claim when the claim is read in light of the remainder of the specification to which it relates.  See Union Pac. Res. Co. v. Chesapeake Energy Corp., 236 F.3d 684, 692 (Fed. Cir. 2001).  The claims must "delineate

the scope of the invention using language that adequately
notifies the public of the patentee's right to exclude."
Datamize, LLC v. Plumtree Software, Inc., 417 F.3d 1342, 1347
(Fed. Cir. 2005).

There are a number of cases in which summary judgment has
been granted for failure to comply with the written description
requirement of 35 U.S.C. § 112.  See, e.g., Noah Sys., Inc. v.
Intuit Inc., 675 F.3d 1302 (Fed. Cir. 2012); Atl. Research
Marketing Sys., Inc. v. Troy, 659 F.3d 1345, 1353 (Fed. Cir.
2011); Athletic Alternatives, Inc. v. Prince Mfg., Inc., 73 F.3d
1573, 1581 (Fed. Cir. 1996).

Determining whether a patent claim fails to meet the
definiteness and written description requirements of section 112
requires both legal and factual determinations.  See IGT v.
Bally Gaming Int'l, Inc., 659 F.3d 1109, 1119 (Fed. Cir. 2011).
Courts cannot declare a claim indefinite simply because it may
be difficult to construe: a claim is definite if its meaning is
discernible, even though the effort of arriving at that
definition may be formidable.  See id. ("A claim is definite if
one skilled in the art would understand the bounds of the claim
when read in light of the specification.  A claim is only
indefinite if it is not amenable to construction or is insolubly
ambiguous."); Bancorp Servs., LLC v. Hartford Life Ins. Co., 359
F.3d 1367, 1372 (Fed. Cir. 2004).  However, a claim will be

9

deemed insolubly ambiguous where a movant can show by clear and convincing evidence that one skilled in the art cannot discern the outer boundaries of the claim based on the language of the claim, the specification, the prosecution history, and knowledge of the relevant art.  Halliburton Energy Servs., Inc. v. M-I LLC, 514 F.3d 1244, 1249 (Fed. Cir. 2008).

II.  Analysis

Here, the question is whether anyone can understand what the terms "content dependent" and "content independent" data decompression mean--that is, how is data decompression content dependent or independent and/or what techniques described in the invention relate to or rely upon those concepts?  What would it mean to have decompression be content dependent or content independent?  Those are questions which must be comprehensible to one skilled in the art in order for the claims at issue to pass muster under 35 U.S.C. § 112.

Defendants argue that the claims at issue fail to meet the definiteness and written description requirements of 35 U.S.C. § 112 for the following reasons: first, defendants assert that the terms "content dependent data decompression" and "content independent data decompression" are indefinite because, put simply, nothing differentiates "content dependent" from "content independent" data decompression.  (Defs. Mem. of Law in Supp. of Mot. for Partial Summ. J. ("Defs. Mem.") (Dkt. No. 429) at 11.)

10

Stated otherwise:  data decompression uses the algorithms chosen in connection with the encoding process--i.e., the words "content independent" or "content dependent" have no meaning at the decompression stage of the process.

Thus, according to defendants, it is "impossible to determine whether any particular data decompression technique counts as "'content dependent data decompression,' 'content independent data decompression,' both or neither." (Defs. Mem. at 11.)  Thus, according to defendants, the terms are insolubly ambiguous.  Defendants' argument boils down to the proposition that each limitation of a claim must be construed so that it has meaning; here, they argue that that cannot be done.

Second, defendants argue that even if the terms "content dependent" and "content independent" data decompression are not insolubly ambiguous (which the Court finds they are), the claims to which they relate nonetheless fail the written description requirements of 35 U.S.C. § 112.  Defendants claim that this requirement has not been met because (a) the term "content dependent data decompression" is never used in the specification of either patent and "nothing in either patent provides either term with any written description support for any definite or substantive meaning," and (b) there is no written description support for the limitations that require decompression using either content dependent or content independent techniques.

(Defs. Mem. at 21.)  All of defendants' arguments turn on the same fundamental proposition (explored further below) that no part of the data decompression process requires--or even involves--reference to the data content.

There are a number of steps in the data compression process that refer to aspects of the invention that require data analysis to determine if content dependent or content independent data compression is utilized.  However, as mentioned above, the specification is perfectly clear on its face--and it is likewise clear in the declarations of both experts submitted in connection with this motion--that once the algorithm(s) has been determined and noted in the descriptor, whether compression was done "dependently" or "independently" of the data content loses its relevance.  More to the point, all that is left to be done in decompression is to reverse the compression (however that compression was achieved) using the matching algorithm.  On this, both experts agree.  (Storer Decl. ¶¶ 22, 24, 32; Shamos Decl. ¶ 17.)  There is no step in the actual decompression process that requires content analysis or reference--content independence and dependence have no meaning during data decompression.  Thus, the usage of the terms "content" and "dependent/independent" in relation to decompression make no sense: they are insolubly ambiguous.

In support of plaintiff's opposition to this motion, Dr. Shamos makes a number of statements directly supportive of defendants' positions. He states that "the <u>descriptor</u> tells the system how decompression should be performed." (Shamos Decl. ¶ 8 (emphasis added).) He conceded that never once in the "Summary of Invention" is decompression mentioned. (<u>Id.</u> ¶ 9.) He states, "All that is necessary (<u>e.g.</u>, in claim 1 of the '651 Patent) is for the decoding process to select the proper decoder corresponding to the encoder that was used to compress the data being decompressed." (<u>Id.</u> ¶ 14.) He also states that "[a]dding 'de' to 'compression' to yield the word 'decompression' simply means reversing the effect of compression." (<u>Id.</u> ¶ 15.) He further states that "the decompression algorithm is the reverse of whatever compression algorithm was used to encode the data." (<u>Id.</u> ¶ 17.)[4]

Dr. Shamos' declaration provides no support for any step in the data decompression process that requires content analysis--

---

[4] Dr. Shamos attempts to illustrate defendants' incorrectness by using an example of two types of hotel unlocking methods: key and wireless. He incorrectly states that defendants would have it "that there is no discernible difference between key unlocking and wireless unlocking (although there clearly is a difference) because in both of them the unlocking method is the reverse [of] whatever method was used to perform locking." (Shamos Decl. ¶ 17.) That misunderstands defendants' point. The point is that once it is determined at the initial stage whether key or wireless unlocks the door (<u>e.g.</u>, the equivalent of determining which algorithm to use during data compression), then all one needs to do is discard the useless technique, for instance holding onto the key, and use the key at the back end. Once one knew that the key unlocks the door and not a wireless technique, it would certainly make no sense to try to use the wireless technique. So too here: once the content analysis has occurred once, and an algorithm has been chosen, there is no need to, and the invention never requires that, the content be analyzed in connection with data decompression.

or what content dependency or independency in connection with
data decompression could mean.[5]  This necessarily means that the
terms "dependent" and "independent" data decompression are
without meaning--or if they have meaning, they are insolubly
ambiguous in the manner in which the invention is described and
set forth.  This is consistent with the declaration of Dr.
Storer, submitted in support of defendants' motion.[6]

    Dr. Storer states, and Dr. Shamos does not dispute, that
both the '747 and '651 Patents are principally focused on data
compression.  (Storer Decl. ¶ 18.)  Dr. Storer states, and Dr.
Shamos does not contradict, that "the terms 'content dependent
data compression' and 'content independent data compression' are
not terms of art used in the data compression field."  (Id.
¶ 31.)  According to Dr. Storer, "'Content independent data
decompression' or 'content dependent data decompression' are not
terms with known meanings to persons of skill in the art."  (Id.
¶ 34.)[7]  He also confirms, as Dr. Shamos asserted, that

_____

[5] He simply makes the conclusory assertion that "'content dependent data
decompression' simply means a process that reverses the effect of 'content
dependent data compression.'  'Content independent data decompression
likewise means a process that reverses the effect of 'content independent
data compression.'" (Shamos Decl. ¶ 7.)  That is insufficient to create a
triable issue of fact.  See Fletcher, 68 F.3d at 1456.

[6] Dr. Storer is the founder of the Annual Data Compression Conference, he has
researched and written extensively in the areas of data compression and has
authored or coauthored over one hundred publications in the areas of data
compression, content based image retrieval, image and video processing and
parallel computing.  He has written a textbook on data compression.  (Storer
Decl. ¶¶ 10, 12.)

[7] Dr. Shamos does not outwardly contradict that assertion, but instead states
that "[a]ll that is needed is an understanding of whether the corresponding

decompression in the '747 and '651 Patents is the reverse of the
compression algorithm used to encode the data:  "An encoded data
block is decoded in a way that Realtime calls the 'reverse' of
the encoding algorithm.  If decompression is attempted using a
different algorithm, the decompressed data is incomprehensible
and useless."  (Id. ¶ 32; see also Shamos Decl. ¶¶ 15, 17.)
Regarding the role of the descriptor, Dr. Storer asserts, "The
patent teaches that the descriptor appended to the data block
will identify which algorithm was used," but adds that there is
nothing in the specification which indicates that the descriptor
would contain any information as to whether the encoding was
content dependent or content independent.  (Storer Decl. ¶ 33.)
Dr. Shamos states that the descriptor "tells the system how
decompression should be performed" because "if the system does
not understand the significance of the descriptors in the
encoded data stream, it cannot know which decompressor to use on
a particular data field or data block and decompression will
fail."  (Shamos Decl. ¶ 8.)  But what Dr. Shamos omits from that
analysis is precisely the step that Dr. Storer discusses--i.e.,
the descriptor providing information for the choice of

---

encoder was chosen by knowing the data block type (content data
decompression) or not knowing the data block type (content independent data
compression)."  (Shamos Decl. ¶ 16.)  That is simply a regurgitation of Dr.
Shamos' "reverse" argument that the Court finds not only conclusory, but also
not helpful to illuminating how decompression could be content dependent or
independent.  That is likely because decompression is, as discussed, not.
Rather, decompression depends simply upon the algorithm used at the time of
compression.

algorithm.  As discussed at length, once the algorithm is
selected during compression, all that needs to be done is apply
the reverse of that algorithm during decompression.  (See, e.g.
Shamos Decl. ¶¶ 15, 17.)

Dr. Storer states that content dependent and content
independent data compression are techniques for finding the
right algorithm to use--they are not themselves algorithms.
(Storer Decl. ¶ 36.)  That means that once the **technique** for
compression is used (e.g., dependent or independent), and
information about the algorithm selected as a result of that
process is placed in the descriptor, there is no logical reason,
and none is explained, as to what content dependent or
independent data decompression **could** mean.  As Dr. Storer
states, and this is in fact supported by Dr. Shamos,

> once the data has been encoded, a user skilled in the
> art has essentially no choice as to what algorithm is
> employed to decompress.  It has long been known in the
> field that data compression can be 'reversed' using
> the same (or the reverse of the) algorithm that was
> used to compress it.  Otherwise, there is no useful
> output.

(Id. ¶ 41.)  Dr. Storer states, and this is not contradicted by
Dr. Shamos (whose references to understanding the decompression
algorithm are focused on the information in the descriptor),
that "the patents do not know how to choose that decompression
algorithm based on whether 'content dependent' or 'content
independent' data compression had been 'utilized' to select the

16

compression algorithm that provided the highest level of

compression." (Id.)

However, as Dr. Storer points out, despite the insoluble

ambiguity in the terms when used in connection with

decompression, they nonetheless purport in the claims to impose

limitations.   Indeed, they are set forth in the claims as

mutually exclusive alternatives.   Specifically, claim 1 of the

'747 Patent requires that

> Decompressing the data block with a selected
> lossless decoder utilizing content dependent data
> decompression if the descriptor indicates the data
> block is encoded utilizing content independent data
> compression, and
>
> Decompressing the data block with a selected
> lossless decoder utilizing content independent data
> decompression, if the descriptor indicates the data
> block is encoded utilizing content independent data
> compression.

'747 Patent, claim 1.

As Dr. Storer notes, and this is similarly uncontradicted

by Dr. Shamos, decompression is based on the compression

algorithm--not the technique used to choose that algorithm.

(See, e.g., Storer Decl. ¶¶ 41-43.)   Dr. Storer concludes, "a

person skilled in the art would not be able to understand the

meaning of the patent claims because they provide no discernible

distinction between 'content dependent data decompression' and

'content independent data decompression.'"   (Id. ¶ 46.)   He

correctly notes that since Dr. Shamos conceded that

17

decompression is merely reversing the method of compression, then the words in the claim set forth above following the word "utilizing" are superfluous. (Id. ¶ 47.)  In other words, the claim limitation could read, without any loss of meaning, "decompressing the data block with a selected lossless decoder."

In addition to the complementary descriptions from both experts as to what occurs as part of the decompression process, there is additional support for "content dependent data decompression" failing the written description requirement.  The attorney who wrote the applications for the '747 and '651 Patents, as well as for a lineal ancestor of both (i.e., the '024 Patent), testified at his deposition that the compression methods and system disclosed in the '024 Patent had nothing to do with content dependent data compression or decompression. (Defs.' Supplemental Submission in Support of Partial Summ. J. ("Defs. Supp.") (under seal) at 3.)  The systems and methods of the '024 Patent provide material with respect to only content independent data compression; thus, it is not possible that the '024 specification provides any basis for a content dependent claim or limitation.  (Id.)  The patent attorney testified that no material was added to the continuation in part of the '024 Patent in connection with the other patent applications that added material relating to content dependency.  (Id.)

Moreover, Dr. Shamos has stated that the conventional
decompression methods as disclosed in the '024 patent "would
fail at least because they would not be able to make use of the
descriptors in the data stream." (Shamos Decl. ¶ 6.) Thus, the
patent specifications do not have written material that tells
the public anything about specific decoders that would be used
in connection with content independent data decompression or
content dependent data decompression. (Defs. Supp. at 4.)

There is no factual dispute between Drs. Storer and Shamos
that creates a triable issue on this motion. The terms "content
dependent data decompression" and "content independent data
decompression" are undefined and meaningless. Dr. Shamos'
declaration does not provide any meaning to the terms. While
content dependency and independency have a great deal to do with
the compression claims in the inventions, they lose all meaning
once the encoding process has occurred and the descriptor is
appended. All that matters from that point forward is what
encoder was used--not the method of its selection (i.e., not the
content on which the encoder selection was based). Simply put,
decompression has everything to do with the algorithm used at
the front-end compression and nothing to do with the content on
which the selection of that algorithm was based. That presents
a mind-twisting conundrum regarding the meaning of the terms at
issue--i.e., a conundrum that 35 U.S.C. § 112 was designed to

prevent.  Accordingly, the terms cannot be construed, they are indefinite, and the claims purporting to be based upon them are invalid.

In addition, however, use of the terms in the claims fails the written description requirement.  There is no guidance in the specifications or claims, and none that either expert was able to provide on this motion, that would put members of the public on notice as to what is meant to be captured by content dependent data decompression that is distinct from content independent data decompression that is distinct from routine reversal of compression by use of well known methods of decompression.  35 U.S.C. § 112 requires more.  Accordingly, the claims at issue fail the written description requirement.

CONCLUSION

For the reasons set forth above, defendants' motion for partial summary judgment is GRANTED.

Claims 1, 7, 8 and 13 of the '747 Patent and Claims 1, 4, 6, 7 and 12 of the '651 Patent fail to comply with the definiteness and written description requirements of 25 U.S.C. § 112 and thus, are invalid.

20

The Clerk of the Court is directed to terminate the motion at Docket No. 428 in 11 Civ. 6696.


        SO ORDERED:

Dated:      New York, New York
            June 27, 2012

                                 KATHERINE B. FORREST
                               United States District Judge